# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **ROBERT FLETCHER STANFORD, SR.** and | ) | Case No. 19-01846-TOM-11 |
| **FRANCES SHARPLES STANFORD,** | ) | |
| | ) | |
| **Debtors.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case came before the Court on March 1, 2021 and March 11, 2021, for a hearing on creditor ServisFirst Bank's Motion to Dismiss or Convert to Chapter 7 (Doc. 404, the "Motion"),[1] the Debtors' Response and Objection to ServisFirst Bank's Motion to Dismiss or Convert to Chapter 7 (Doc. 423), and ServisFrst Bank's Reply to Debtor's Response and Objection to ServisFirst Bank's Motion to Dismiss or Convert to Chapter 7 (Doc. 433). Appearing before the Court were Frederick M. Garfield, attorney for Robert Fletcher Stanford and Frances Sharples Stanford; Brian Walding and E. Bryan Nichols, attorneys for ServisFirst Bank ("ServisFirst"); Joseph O'Donnell, owner of Fergus Media, LLC as witness for ServisFirst; Don Wright, former restructuring officer of American Printing Company, Inc as witness for the Debtors; Jon Dudeck, attorney for the Bankruptcy Administrator; and Robert Fletcher Stanford and Frances Sharples Stanford, Debtors. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a) and the District Court's General Order of Reference Dated July 16, 1984, as Amended July 17, 1984.[2] This is a core proceeding arising under Title 11 of the United States Code as defined in 28

---

[1] This Motion was filed pursuant to 11 U.S.C. § 1112. Subsection (b)(3) of § 1112 provides for a hearing to commence within 30 days of a motion having been filed. However, this Court found the existence of "compelling circumstances" that pushed the hearing beyond the initial 30-day deadline set forth in the statute. Section 1112(b)(3) also provides that a court "shall decide the motion not later than 15 days after commencement of such hearing." This decision is being timely rendered within 15 days after commencement of the hearing.

[2] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:

U.S.C. § 157(b)(2)(A) and (O).[3] The Court considered all of the evidence offered at the hearing, as well as testimony and evidence from prior hearings in this case (including, among other things, documents that either are a part of the Court's electronic file or that have been placed in the record during prior hearings), the arguments of counsel, and the law, and finds and concludes as follows:[4]

## FINDINGS OF FACT[5]

The Debtors filed this Chapter 11 bankruptcy case on May 3, 2019, the same day that their business, American Printing Company, Inc. ("American Printing") filed its own Chapter 11 case.[6] In addition to American Printing either Mr. Stanford or Mrs. Stanford own interests in various other business entities: American Interactive Marketing, LLC ("AIM"); Stanford, Jones & Loyless, LLC;[7] D2 Design; Maison de France, LLC; Willow Apartments, Ltd.; and Le Petite Chateau. Doc. 354.

ServisFirst, a creditor of both American Printing and the Stanfords individually, has been active in each of the cases.[8] On May 5, 2020, the American Printing bankruptcy case was converted to a Chapter 7[9] on a motion filed by the Bankruptcy Administrator. Case No. 19-01844,

---

The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

[3] 28 U.S.C. §157(b)(2)(A) provides as follows:
  (b)(2) Core proceedings include, but are not limited to–
    (A) matters concerning administration of the estate;
  . . . .
    (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor . . . relationship . . .[.]

[4] This Memorandum Opinion and Order constitutes findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to contested matters in bankruptcy pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

[5] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

[6] The American Printing Company, Inc. bankruptcy, case number 19-01844, was also assigned to this Court.

[7] Stanford, Jones, & Loyless, LLC is in a pending Chapter 11 bankruptcy, case number 20-00503, also assigned to this Court.

[8] ServisFirst is also a creditor of Stanford, Jones & Loyless, LLC and is active in that Chapter 11 bankruptcy case.

[9] American Printing is no longer operational and its bankruptcy case has been closed.

Docs. 217, 235. ServisFirst now seeks conversion to Chapter 7 or dismissal of the Stanfords' individual case based on several grounds including failure to disclose assets in the schedules, reports and pleadings; nondisclosure of significant post-petition transactions, failure to seek and obtain court approval for such transactions, failure to seek and obtain court approval for employment of a professional, and questionable intermingling of corporate and individual assets.

On December 31, 2016, a few years prior to the filing of this bankruptcy case, Robert Stanford conveyed all of his interest in Fergus Media, LLC ("Fergus Media'), the publisher of B-Metro Magazine, to Joseph O'Donnell by way of a Membership Interest Purchase Agreement.[10] In return, Mr. O'Donnell gave Mr. Stanford a promissory note payable to Mr. Stanford individually in the amount of $1,000,00.00 (the "2016 Note") secured by Mr. O'Donnell's membership interests in Fergus Media, as evidenced by a Membership Interest Pledge Agreement[11] (collectively, the "2016 Transaction").[12] Don Wright,[13] a former restructuring officer of American Printing, testified that although the 2016 Note was payable to Mr. Stanford individually, it was actually carried on the books of American Printing.

The testimony and evidence presented revealed that after Mr. O'Donnell defaulted on his payment obligations, another transaction (the "2020 Transaction")[14] took place in which Mr. Stanford's company AIM purchased all or substantially all of Fergus Media's assets, and as part of the 2020 Transaction, AIM acquired "not only B-Metro's publishing rights and intellectual

---

[10] At the hearing, Mr. O'Donnell testified that initially Fergus Media was owned by Mr. Stanford (51% of the shares), three other people (5% of the shares each) and Mr. O'Donnell (the remaining shares). Because the magazine published by Fergus Media had not been as profitable as the three others had hoped, the three concluded sometime in 2014 that they should give back their shares in Fergus Media back to Mr. Stanford.
[11] As part of the 2016 Transaction, Mr. O'Donnell first assigned all of his membership interest in Fergus Media to Mr. Stanford, making Mr. Stanford the sole shareholder. Mr. O'Donnell then purchased 100% of the shares in Fergus Media from Mr. Stanford. Doc. 404.
[12] The documents relating to the 2016 Transaction have been admitted into evidence as ServisFirst Ex. C.
[13] At the continued hearing on March 11, Mr. Stanford testified that at some point he had re-employed Mr. Wright part-time to provide accounting services, and that AIM had paid Mr. Wright $1800 for "my accounting."
[14] The documents relating to the 2020 Transaction have been admitted into evidence as ServisFirst Ex. D.

3

property, but also certain of the computers, furniture, fixtures, and equipment, contract rights, accounts receivable in the amount of $78,247.50." Doc. 404 at 4; *see also* ServisFirst Ex. D.  Also, as part of the 2020 Transaction, Mr. O'Donnell's obligation to Mr. Stanford individually under the 2016 Transaction promissory note in the amount of $1,000,000.00 was reduced to $420,000,000 by way of an Amended and Restated Promissory Note dated June 9, 2020 (the "2020 Note), given by Mr. O'Donnell to Mr. Stanford individually.  Mr. O'Donnell testified that the reduced amount of the 2020 Note was a result of payments that he had made and a realistic view of the value of the magazine.

The testimony of Mr. Stanford was clear that he did not disclose on his bankruptcy schedules the 2016 Transaction, including the 2016 Note that was a personal asset of his, nor did he amend his schedules to disclose the 2020 Transaction, including the 2020 Note that reduced the amount due to him by Mr. O'Donnell.  On January 19, 2021, the Stanfords finally amended their bankruptcy schedules to reflect a Note from Mr. O'Donnell.[15]  Question number 30 on the amended Schedule A/B: Property now reflects: "[u]ncollectible and defaulted O'Donell Promissory Note ($1,000,000 face amount) ($1.00 unliquidated)." Doc. 431.  In other words, Mr. Stanford represents that the current value of the Note is $1.00.

During his testimony Mr. Stanford admitted that the 2016 Note from Mr. O'Donnell was not included in his bankruptcy schedules but explained that the omission was inadvertent. Mr. Stanford testified that at the time he was preparing to file American Printing's bankruptcy as well as his own personal bankruptcy there was a lot going on, and he simply forgot about the 2016 Note; however, he stated that he would have disclosed the 2016 Note had he remembered it.[16]

---

[15] Don Wright testified that the 2016 Note was carried on the books of American Printing; however, the 2016 Note was not disclosed in the schedules of that case either.

[16] No testimony or explanation was provided regarding why Mr. Stanford filed the amendment only after the Note was disclosed by ServisFirst, instead of filing it in June 2020 when the Note was renegotiated.

4

Case 19-01846-TOM7    Doc 467    Filed 03/15/21    Entered 03/15/21 13:01:26    Desc Main
Document    Page 4 of 19

At the hearing both Mr. O'Donnell and Mr. Stanford testified regarding the circumstances around the 2020 Transaction, which happened more than one year after the Stanfords' bankruptcy filing. Both Mr. O'Donnell and Mr. Stanford indicated that at some point after the 2016 Transaction Mr. O'Donnell had difficulty paying his debts. Mr. Stanford testified that the idea came about that he would reacquire the Fergus Media assets. Attorney Greg Mixon, who had handled the 2016 Transaction, was again consulted by Mr. Stanford for the new transaction. Mr. Stanford testified that it did not occur to him that he needed to consult with his bankruptcy counsel; thus, the 2020 Transaction went forward with no notice to this Court and with Mr. Stanford employing – any paying[17] – counsel who had not been approved by this Court.

During the hearing counsel for ServisFirst elicited testimony regarding two bank accounts that had been opened post-petition at the direction of Mr. Stanford. One account was opened in the name of Fergus Media in 2019 even though Mr. Stanford did not have an interest in Fergus Media at that time. Mr. O'Donnell explained that Mr. Stanford asked him for permission to use Fergus Media's EIN number to open the account because Mr. Stanford was attempting to get his company AIM "reinvigorated" at the time and could not open an account in AIM's name.[18] The other account opened post-petition was an account for AIM, opened at CB&S Bank on January 23, 2020. ServisFirst Ex. G.

Counsel for ServisFirst questioned Mr. Stanford about numerous transactions made through either the Fergus Media account or the AIM account that appeared to be personal transactions. On May 12, 2020, for example, a check for $500 made to Mrs. Stanford cleared the

---

[17] The Debtors sought and obtained Court permission to employ and pay a special attorney to handle their appeal of a previous order. Thus, Mr. Stanford knew or should have known he was required to seek Court approval for hiring an attorney post-petition.

[18] The Fergus Media account at CB&S Bank was opened November 19, 2019, subsequent to the Stanfords' bankruptcy filing date of May 3, 2019. ServisFirst Ex. F.

5

AIM account. According to Mr. Stanford, he wrote this check to Mrs. Stanford because she needed $500.[19] Other transactions included multiple, frequent debit card transactions to cigar shops for more than $3,700 from the AIM account, and a check from the AIM account payable to Mr. Stanford in the amount of $2,500. According to the memo on the check, the check was purportedly for a "loan payment;" however, Mr. Stanford testified that he was not sure what it was for, as he just put something down on the check. It was Mr. Stanford's testimony that he did not pay himself from AIM but instead used the AIM account for personal expenses as well as business expenses. He testified that he did not think he used the Fergus Media account as a personal account, although he possibly did if he needed to do so. Mr. Stanford further testified that he believed some of the personal transactions made their way onto his personal operating reports filed with the bankruptcy court. He admitted that copies of the AIM bank statements were not included in his reports to the Court in his personal bankruptcy case.

At the end of the day's testimony on March 1st, this Court provided a recess in order for counsel for the Stanfords to provide evidence to the Court that the numerous personal transactions made from the Fergus Media and AIM accounts were included as income on the Debtors' monthly operating reports. The Court also requested that counsel provide documents reflecting alleged business services performed by AIM resulting in large deposits into the AIM bank account. Counsel did provide numerous documents (approximately 2,800 pages)[20] to the Court within the

---

[19] Mr. Stanford testified that Mrs. Stanford was not employed by AIM.
[20] Counsel for the Debtor provided the Court, opposing counsel, and the Bankruptcy Administrator with access to a "dropbox" containing an additional 2,800+ pages of various documents. The Court has a long-standing policy that is made clear to counsel prior to every trial that it conducts, and was made clear to counsel prior to this trial, that counsel has the responsibility to bring to the Court's attention the relevant portions of any documents that counsel wants the Court to consider; the Court will not comb through voluminous documents in order to find relevant information. However, upon a cursory review of some of the documents it appears there is some duplication of pages, and furthermore, the relevancy and purpose of many of the documents is unclear; thus the documents appear to be unhelpful.

In addition to duplication of some documents, the additional 2800+ pages were not in chronological order. Furthermore, instead of providing documents from early 2020 when the CB&S Bank account was active, the

time allotted to do so; however, the documents were not helpful in convincing the Court 1) that the "income" had been properly reported and disclosed, and 2) of the sources of the deposits into the AIM account.

The Court's basic review of the bank statements of the AIM account at CB&S Bank from roughly the end of January 2020 through the end of June 2020 reveals that over $10,000 went toward expenses that appear to be and could have been personal in nature, such as to Walmart and Publix, utility expenses, purchases from Amazon, purchases from Best Buy, Lowe's and Home Depot, substantial purchases at cigar shops, and unidentified withdrawals. *See* ServisFirst Ex. G. It is certainly possible that some of these expenses could have been of a busines nature, but as noted, Mr. Stanford did not provide any useful evidence for the Court to make such a determination.

At the continued hearing on March 11, after counsel for the Stanfords raised the issue of Mrs. Stanford's business Maison de France, LLC, ServisFirst questioned Mrs. Stanford about various transactions in the business's bank account that also appeared to be in the nature of personal expenses; for example, payments for veterinary bills, to a Land Rover dealership, to car washes, and for cell phone bills. Mrs. Stanford testified that most of the transactions for personal expenses that came out of the Maison de France account were made by her daughter, who is a part owner of the business. However, Mrs. Stanford admitted that at least one expense identified by counsel for ServisFirst as a possible personal expense, to Firestone for tires, was hers. Another transaction that Mrs. Stanford identified as hers was a $7,500 check to Mr. Stanford dated February

---

production included primarily documents that were from the latter half of 2020 when, according to Mr. Stanford's testimony, the CB&S Bank account was no longer active.

It is unclear why, given its announced policy that the pertinent portions of submitted documents be made known to the Court, the Stanfords believed that sending a deluge of documents to the Court was helpful unless they had some thought or hope that doing so might garner a continuance of the trial or some sort of other assistance.

3, 2020, that she referred to as a loan, made because Mr. Stanford needed the money. *See* ServisFirst Ex. CC at 830. The testimony revealed that this "business" account saw both deposits and debits of approximately $1,000,000 around a one-year time period.

At the resumed hearing on March 11, on examination of Mrs. Stanford by counsel for ServisFirst, it was disclosed for the first time that the Stanfords had an account, or an annuity,[21] with Brighthouse Financial containing funds in excess of $60,000. *See* ServisFirst Ex. DD at 991-92. Mrs. Stanford's testimony revealed that this asset was never listed on the schedules and never disclosed in either the Debtors' Disclosure Statement or any exhibits to the Disclosure Statement. This money was withdrawn by the Stanfords in November 2020, and on November 24, 2020, the Stanfords proceeded to deposit over $60,00 from an undisclosed source (presumably the Brighthouse account) into a personal joint account (ending in 2362) that testimony revealed was primarily used by Mr. Stanford. *See* ServisFirst Ex. BB at 626, 629, 631. Interestingly, ServisFirst filed its Motion seeking conversion or dismissal on November 13, 2020, after the time that the funds were withdrawn but before the funds were deposited on November 24, 2020. Thus, at the time the undisclosed funds were deposited, the Stanfords had (presumably) seen the Motion complaining of their failure to disclose the $1,000,000 Note and knew, or should have known, that failure to disclose assets was problematic.

Because the Stanfords did not seek Court permission to withdraw this large sum of money from the Brighthouse account, neither the Bankruptcy Administrator nor any creditors were aware of the transaction when it occurred. Even more troubling, Mr. Stanford's testimony reflected that the funds were then transferred from the personal joint account to an AIM corporate account – not another personal account – by way of several "mobile device transfers."[22] Mr. Stanford testified

---

[21] "Annuity" was the term used by counsel for the Stanfords.
[22] Mr. Stanford testified that there were four "mobile device transfers" in the amount of $10,000 each and one "mobile

8

that he then wrote a check for $44,000 from the AIM account for the roof work on the Stanfords' personal residence. The November 30, 2020 AIM bank statement does not support Mr. Stanford's testimony, however. There is no $44,000 check reflected in the statement; instead, the statement shows three checks that could perhaps be for roof work – one in the amount of $36,119 to a slate company, one in the amount of $1,221.86 to a roofing company, and one in the amount of $6,555 to a sheet metal company. ServisFirst Ex. AA at 27. In addition, the checks are dated November 19th, prior to the mobile device transfers that occurred November 25th.

The Court finds these transactions troublesome due to the way they were structured. Because Mr. Stanford moved funds by way of mobile device transfers instead of writing a check, the Stanfords' operating report for November 2020 reflected only that the money came in and went back out. Doc. 414; *see also* ServisFirst Ex. BB at 623, 626-31. The exact nature of the transactions was basically hidden as there was no way for the Court, the Bankruptcy Administrator or any creditors to know what had happened, despite the fact that operating reports are designed and intended to reflect all income and expenses of Chapter 11 debtors.

The $44,000 funds were apparently used for roof repairs or replacement costs in excess of the $42,000 of insurance proceeds that the Debtors represented they had received for this purpose. Although the testimony was clear that $42,000 in insurance proceeds was available for roof work, the Court has not been advised as to whether these funds were paid directly to a roofing contractor, paid to the debtors then deposited into a non-personal account, or if the transaction occurred in some other way.

Prior to the hearing on ServisFirst's Motion, the Court was already familiar with the Stanfords' roof repair or replacement issue, as the Stanfords had previously sought Court approval

---

device transfer" for $4,000. However, the November 30, 2020 AIM bank statement reflects only $40,000 in "mobile device transfer" deposits. ServisFirst Ex. AA at 22.

9

to use non-exempt funds for roof work. See Doc. 380. In October 2020, when the Stanfords filed an amended request seeking Court approval for roof repair or replacement, they indicated that insurance would only pay for the portion of the repair or replacement that was necessary, at a cost of $42,000. At the time, the Stanfords' attorney was holding estate money in his escrow account. The Stanfords were insistent that the entire roof needed replacing, and they requested the use of $71,000 of those escrowed funds to pay for what the insurance did not cover. The Court held several hearings in an attempt to give the Debtors every opportunity to justify their request over the objections raised by ServisFirst and the Bankruptcy Administrator. The Court ultimately denied the Stanfords' request but noted on the record that they had exempt funds in some IRA accounts that they could request use of for the project. *See* Doc. 356, audio from August 31, 2020 hearing. Apparently, soon after the Court disallowed the Stanfords' request to use the non-exempt estate funds held by their attorney, they pursued other non-exempt, and undisclosed, funds to achieve their goal without Court approval or notice to parties.

Prior to this hearing, in which many facts have come to light for the first time, this Court approved the Debtors' Amended Disclosure Statement (Doc 359). Attached to the Amended Disclosure Statement was a liquidation analysis which purportedly included all of the Stanfords' assets, including accounts of any type. The testimony elicited at this hearing reflects that neither the $1,000,000 Note nor the Brighthouse account were included in either the Stanfords' schedules or the liquidation analysis.

The Court notes that, based on the testimony and evidence presented, both Mr. and Mrs. Stanford, in their respective businesses, failed to keep personal and business expenses separate, and failed to sufficiently identify transactions in the business accounts that were actually for personal expenses. The Court had visited this issue with the Stanfords before. At a hearing on

10

August 31, 2020, the Court addressed the Stanfords' payment of $3,500 toward a mortgage for the benefit of debtor Stanford, Loyless & Jones, LLC. At that hearing, the Court cautioned the Stanfords about intermingling assets and income between a corporate debtor and individual debtors. Nevertheless, the Stanfords have continued their failure to maintain separate identifies between themselves and their businesses, even though four of the businesses are corporate entities that, by design, are supposed to maintain their own distinct identities.

At the conclusion of the hearing it was clear to this Court that the Stanfords have failed to properly list all of their assets in their schedules and in their Disclosure Statement, have ignored the separate corporate structure of their various entities, have disregarded the corporate veil between businesses affairs and their personal affairs, and have intermingled funds between multiple business accounts and personal accounts.

## CONCLUSIONS OF LAW

Conversion or dismissal of a Chapter 11 case is governed by Bankruptcy Code § 1112(b), which provides that, for cause, a Chapter 11 case shall either be converted to Chapter 7 or dismissed, "whichever is in the best interests of creditors and the estate . . . ." 11 U.S.C. § 1112(b)(1). The statute sets forth several examples of cause, but the list is not exhaustive. *In re Whitten*, 473 B.R. 380, 382 (Bankr. D. Colo. 2012). In this case, the grounds for conversion or dismissal that the Court deems most relevant are the Stanfords' gross mismanagement of the estate, their failure to comply with reporting requirements, and their nondisclosures.

Cause for dismissal has been found where a Chapter 11 debtor fails to abide by the reporting requirements set forth in the Bankruptcy Code:

> Under 11 U.S.C. § 1106(a)(1), a debtor-in-possession is required to perform the duties specified in § 704(8) which mandates the filing of periodic operating reports and summaries and such other information as the United States Trustee or Court requires if the business of the debtor is authorized to be operated. An

11

"unexcused failure to satisfy timely any filing or reporting requirement established by [the Bankruptcy Code] or by any rule applicable to a case under [Chapter 11]" is cause for relief under § 1112(b)(4)(F). The United States Trustee is charged with supervising the administration of Chapter 11 cases, including the debtor's performance of its statutory and fiduciary responsibilities. 28 U.S.C. § 586(a)(3). To perform the role assigned to it by Congress, the United States Trustee has adopted reporting requirements embodied in its Guidelines that a debtor-in-possession is required to fulfill. Failure to "timely provide information or attend meetings reasonably requested by the United States Trustee" also constitutes cause for relief. 11 U.S.C. § 1112(b)(4)(H).

*In re Tucker*, 411 B.R. 530, 532 (Bankr. S.D. Ga. 2009) (footnotes omitted).[23] "[D]isregard of reporting requirements can, by itself, be sufficient cause under § 1112(b)." *In re Hoyle*, No. 10-01484-TLM, 2013 WL 210254, at *10 (Bankr. D. Idaho Jan. 17, 2013) (citing *Whetten*, 473 B.R. at 384); *see also In re Tri-Chek Seeds, Inc.*, No. 12-11409, 2013 WL 636031, at *3 (Bankr. S.D. Ga. Feb. 7, 2013) (failure to timely file operating reports "alone is sufficient cause to convert the case"). The importance of reporting requirements was emphasized in *In re Whetten*:

> Monthly reports and the financial disclosures contained within them "are the life-blood of the Chapter 11 process" and are more than "mere busy work." *Matter of Berryhill*, 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991). Without these reports, the UST and creditors cannot determine when a debtor is incurring additional losses, is rendered administratively insolvent, or is transferring assets without authorization. The reporting requirements provide the primary means for monitoring the debtor's compliance with the Code's requirements and they serve as a litmus test for a debtor's ability to reorganize. Thus, non-compliance is not a "mere technicality." *In re Ronald Kern & Sons*, 2002 WL 1628908, at *1 (W.D.N.Y. June 11, 2002). "[H]abitual non-compliance . . . calls in to question a debtor's ability to effectively reorganize." *In re Tucker*, 411 B.R. 530, 535 (Bankr. S.D. Ga. 2009) (quoting *In re 210 West Liberty Holdings, LLC*, 2009 WL 1522047, at *7 (Bankr. N.D. W. Va. May 29, 2009)). If a debtor does not fulfill this basic obligation during the Chapter 11 case, when it knows it will have to come before the court on any number of occasions, how can the creditors have any confidence that the debtor will timely and accurately report its income and make the required distributions under its plan, when the court and the UST are no longer monitoring the case? Consequently, the "importance of [filing] ... monthly report[s] cannot be over-emphasized." *In re Myers*, 2005 WL 1324019, at *2 (10th Cir. BAP May 25,

---

[23] In Alabama, Bankruptcy Administrators in effect fulfill the role of the United States Trustees, as Alabama does not participate in the United States Trustee program. *See* section 302(d)(3)(1), Bankruptcy Judges, U.S. Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. No. 99-554, 100 Stat. 3088 (codified at 28 U.S.C. § 581 (2006)); *see also* Fed. R. Bankr. P. 9035, Advisory Committee Notes.

2005). A debtor ignores this basic duty at its own peril.

*Whetten*, 473 B.R. at 383-84.

Debtors may not simply file the required reports in order to fulfill their obligations. "Filing a piece of paper is meaningless if the content is inaccurate, misleading, or wrong, thus the content of these documents is always relevant." *Tucker*, 411 B.R. at 532. Since operating reports provide a means of monitoring a Chapter 11 bankruptcy case, it is crucial that the operating reports are truthful and accurate:

> Whether Debtor deliberately concealed financial activities, or inadvertently misreported them due to a poor understanding of accounting principles or bankruptcy requirements, the result remains the same. Creditors, the UST and the Court could not accurately and timely gauge Debtor's financial situation, the profitability of Debtor's business, Debtor's ability to live within the budget he set, his compliance with the Code and Rules, or the feasibility of his chapter 11 plan. Even if Debtor did not deliberately file misleading reports, Debtor had a responsibility to file complete and accurate reports. Even now, after Coles reviewed and corrected Debtor's Rule 2015.3 reports, the Court remains unconvinced of the accuracy of the reports.

*Hoyle*, 2013 WL 210254, at *11 (footnotes omitted). In *In re Whitehurst*, another bankruptcy court in the Northern District of Alabama examined a case wherein the debtor disregarded the court's Chapter 11 operating order by not filing all of the required monthly operating reports, and furthermore, the operating reports that were filed contained "incorrect and misleading" information. *In re Whitehurst*, 198 B.R. 981, 986 (Bankr. N.D. Ala. 1996) (Cohen, J.). In addition, the debtor failed to file post-petition taxes even though the debtor claimed to have filed the bankruptcy case for the purpose of repaying past-due taxes. *Id*. In deciding to dismiss the case, the court remarked:

> While any of the above facts would be a sufficient basis for this Court to dismiss this case, collectively these factors demonstrate a complete lack of good faith on the part of the debtor. Based on the facts the Court finds that cause exists for purposes of dismissal under 11 U.S.C. § 1112(b).

Case 19-01846-TOM7    Doc 467    Filed 03/15/21    Entered 03/15/21 13:01:26    Desc Main
Document    Page 13 of 19

*Id*.

"Gross mismanagement of the estate" is a basis for dismissal or conversion of a Chapter 11 case that is specifically set forth in Bankruptcy Code § 1112(b)(4)(B).

> A debtor in possession's responsibility to manage the estate arises from its fiduciary duty to its creditors. The UST argues gross mismanagement based on the unauthorized transfer of estate property, deposits of estate income in a non-debtor in possession account, and financial transactions misrepresented in reports.
>
> Bankruptcy courts have found a wide variety of conduct can establish gross mismanagement. For example, courts have found gross mismanagement due to a failure to attempt to recover property that arguably belonged to the estate, *In re Lodge at Big Sky, LLC*, 2011 WL 2358146 (Bankr.D. Mont. June 8, 2011), and a "failure to justify expenses, comply with financial reporting requirements, and keep accurate accounting records [leading] to a lack of control over estate cash," *In re Visicon Shareholders Trust*, 478 B.R. 292, 309 (Bankr.S.D.Ohio 2012). This Court has previously found that a debtor in possession grossly mismanages the bankruptcy estate by failing to follow the Code and get the Court's approval for post-petition borrowing, paying pre-petition debts, and paying professionals.

*Hoyle*, 2013 WL 210254, at *11 (some internal citations omitted). Good intentions will not protect a debtor from conversion or dismissal due to gross mismanagement:

> A debtor in possession is vested with significant powers under the provision of the Bankruptcy Code. As is often the case, those powers come with certain responsibilities. Significantly, a debtor in possession owes a fiduciary duty to its creditors. Gross mismanagement may be found notwithstanding the debtor's management's good intentions. Failure to maintain an effective corporate management team has been held to constitute gross mismanagement. Mismanagement may include failure by debtor's manager to comply with the requirements of the Bankruptcy Code, including seeking approval for postpetition lending and borrowing, and the failure to keep the court and other parties in interest apprised of the debtor's business operations.

7 Richard Levin & Henry J. Sommer, *Collier on Bankruptcy* ¶ 1112.04[6][b] (16th ed. 2020) (internal quotations and citations omitted).

In this case, the Stanfords' management of their finances and their fulfillment of their bankruptcy duties fall far short of what is required of debtors in a Chapter 11 case. Mr. Stanford admittedly failed to disclose the 2016 Note in the amount of $1,000,000, on the Stanfords' personal

14

bankruptcy schedules. *See* 11 U.S.C. § 521(a). Mr. Stanford testified that he did not intentionally omit the Note; however, omission itself, and not Mr. Stanford's intent, is the relevant point. *See Hoyle, 2013 WL 210254, at \*11*. When Mr. Stanford did disclose the Note from Mr. O'Donnell, he represented that the note had a *de minimis* value. Failure to disclose an asset of insignificant value "does not excuse the concealment of information, which is necessary to the investigation of a debtor's financial condition." *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984).[24] Furthermore, as the testimony and evidence from the hearing has revealed, the nondisclosure of the Note is only one of several nondisclosures in the Stanfords' case; the aggregate amount of nondisclosures completely obliterates any defenses the Stanfords may have had regarding the Note's lack of value or the inadvertence of the omissions.

Mr. Stanford conducted the 2020 Transaction, involving a reduction in the debt due to him personally by Mr. O'Donnell, without disclosing that transaction to the Court, the Bankruptcy Administrator or creditors, and he failed to seek the required Court approval of counsel acting on his behalf. Furthermore, the Stanfords failed to disclose $60,000 in the Brighthouse account, the withdrawal of those funds from the Brighthouse account, the use of those funds, and the details regarding the use of the insurance proceeds. The Stanfords had sought this Court's approval for use of estate funds for this project and it was denied after several hearings, so for the Stanfords to then, within days of that denial, access undisclosed, hidden funds for the project is a clear violation of their fiduciary duties. Collectively, all of these actions by the Stanfords, or rather failures to comply with their statutory duties as debtors, constitutes gross mismanagement of the Stanfords' estate.

---

[24] The *Chalik* case involved denial of a debtor's discharge in part for failure to disclose interests in or relationships with several corporate entities. *Chalik*, 748 F.2d at 617. The debtor had argued that the nondisclosures did not matter because the information would not have revealed assets available to creditors, but neither the district court nor the Eleventh Circuit Court of Appeals agreed. *Id*.

Additionally, Mr. Stanford caused two bank accounts to be opened post-petition, one in the name of Fergus Media (an entity in which he had no ownership) and one in the name of AIM, without Court permission even though the accounts were used at least in part for his personal financial affairs. Mr. Stanford failed to disclose the accounts to the Court, the Bankruptcy Administrator, and his creditors, and it appears that he failed to include on his monthly operating reports all of the funds from those accounts that were used for his personal expenses.[25] In addition, Mr. Stanford obtained a loan in the amount of $7,500 from the Maison de France account that was not disclosed, and for which Court permission had neither been sought nor obtained.

This Court's review of at least some of the bank records introduced into evidence at the hearing reveals that certainly some of the expenditures from the accounts were for business purposes but also that some were unquestionably for the Stanfords' personal benefit; i.e., groceries, home improvement stores, and over $3,700 for cigars. Some transactions could reasonably have been for either business or personal use, such as gas and Amazon purchases, for example. However, it is impossible to tell from the evidence that is before the Court how much of the expenditures belong in either category. Mr. Stanford's testimony reflects that instead of giving himself a salary he paid personal expenses from the business accounts. This Court provided Mr. Stanford with an opportunity to provide information evidencing what transactions were attributable to personal expenses, and that those transactions were disclosed on his monthly operating reports as income, but he was unable to do so.[26]

Another factor the Court has considered came to the Court's attention from prior hearings and documents previously submitted by the Stanfords. It appears that despite being in bankruptcy

---

[25] The 2020 Transaction and these bank accounts were only brought to the Court's attention when ServisFirst became aware of them while investigating the related Chapter 11 case, 20-00503 Stanford, Jones, & Loyless, LLC.
[26] The Court also questions whether the income Mr. Stanford received by paying his expenses from the business accounts was properly disclosed on the Stanfords' tax returns.

the Stanfords continued to lead a lavish lifestyle post-petition. They currently reside in a lake house with a value in excess of $1,000,000, although it is subject to two mortgages. Doc. 359, Ex. E. Some of their monthly expenses include: a home mortgage payment, insurance, property taxes, and neighborhood association dues in the amount of approximately $7,600; utilities, garbage fees, Wi-Fi service, and phone service in the approximate amount of $1,300; and home and yard maintenance in the approximate amount of $850. Doc. 359, Ex. C. It appears to the Court that the Stanfords' expenses may exceed their monthly income, demonstrating a lack of willingness, ability or intent to propose and fund a feasible plan of reorganization.

ServisFirst has demonstrated substantial undisclosed assets and transactions as well as significant, inaccurate reporting by the Stanfords, which also leads the Court to believe they cannot formulate a confirmable plan of reorganization. The Stanfords have failed numerous times to comply with their duties as debtors, and in this Court's view their conduct, at the very least, is gross mismanagement of the estate as contemplated by Bankruptcy Code § 1112(b)(4)(B). ServisFirst has established that cause exists for the Stanfords' Chapter 11 case to be dismissed or converted pursuant to § 1112(b), whichever is in the best interests of creditors and the estate, "unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). Counsel for the Stanfords has requested that the Court appoint a Chapter 11 trustee as opposed to a conversion or dismissal of their case,[27] in part due to their desire to preserve their appeal currently before the

---

[27] Section 1112(b) also provides that a Chapter 11 case may not be converted or dismissed:
> if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, **and** the debtor or any other party in interest establishes that--
> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; **and**
> (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)--

Eleventh Circuit Court of Appeals.[28] However, based on the Stanfords' nondisclosures, inaccurate reports, questionable record-keeping, and failure to comply with Bankruptcy Code requirements, the Court cannot be confident that the Stanfords would be forthcoming and candid with a Chapter 11 trustee. As a result, the likelihood of success of a Chapter 11 trustee is questionable at best. Also, as noted by Mr. Dudeck, the attorney for the Bankruptcy Administrator, there is a significant expense associated with a Chapter 11 trustee. The Stanfords already have substantial expenses totaling $14,000 per month or more without Chapter 11 professional fees.

ServisFirst has uncovered various nondisclosures and instances of inaccurate reporting by the Stanfords, leaving the Court with concerns as to whether there are additional nondisclosures and reporting errors, omissions, and inaccuracies that have yet to be discovered, or whether there are causes of action to investigate and pursue for the benefit of the estate and the Stanfords' creditors. For whatever reasons, both Mr. and Mrs. Stanford have failed to keep their personal and business expenses separated, or even to satisfactorily categorize their personal expenses paid from business accounts. Despite the Court's previous cautions, the Debtors have continued to intermingle personal and corporate assets and have failed to maintain separate identities between themselves and their businesses. The Court has no alternative but to conclude that the Stanfords have ignored the separate corporate structure of the various entities and have disregarded the corporate veil between businesses and personal affairs.

---

(i) for which there exists a reasonable justification for the act or omission; and
(ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2) (emphasis added). Given the evidence presented, the Court does not find the existence of any "unusual circumstances" that would preclude conversion or dismissal of this bankruptcy case.

[28] The Stanfords' counsel argued strenuously against conversion and appointment of a Chapter 7 trustee because of the pending appeal. According to counsel, the Stanfords are optimistic based on oral argument having been scheduled for May 17, 2021. This Court is unwilling to speculate regarding the outcome of the appeal. Also, given the caseload and complexity of cases pending before the 11th Circuit Court of Appeals, a ruling on the appeal could take anywhere from shortly after oral argument to several months or even a significantly longer amount of time. Given the Stanfords' conduct and the potential for additional nondisclosures or other actions that could harm the estate, this Court cannot wait for an outcome on the appeal but must protect this bankruptcy estate.

The Court finds it necessary for a Chapter 7 trustee to thoroughly investigate the Debtors' financial status, their assets, transfers and anything else that is appropriate and relevant to this bankruptcy case, such as the various business entitles owned at least in part by either Mr. Stanford or Mrs. Stanford since they have intermingled their businesses and personal affairs. The Court understands the Debtors' position that they prefer the appointment of a Chapter 11 trustee but finds that the interests of creditors and the estate would be best served by a conversion to Chapter 7. A Chapter 7 trustee would be able to continue the prosecution of the appeal if he or she deems appropriate.[29] In closing arguments, counsel for the Bankruptcy Administrator, having heard all of the arguments and testimony, agreed with ServisFirst that the appointment of a Chapter 11 trustee is not appropriate in this bankruptcy case, and that the best course of action is to convert this case to a Chapter 7. The Court finds that the Motion of ServisFirst Bank is due to be granted and that this bankruptcy case is due to be converted to a case under Chapter 7 of the Bankruptcy Code.

It is therefore **ORDERED, ADJUDGED, and DECREED** that this bankruptcy case is hereby **CONVERTED** to a case under Chapter 7 of the Bankruptcy Code. It is further

**ORDERED, ADJUDGED, and DECREED** that the Clerk's Office shall appoint a Chapter 7 Trustee pursuant to the usual procedures.

Dated: March 15, 2021 /s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

TOM/dgm

---

[29] The Chapter 7 panel trustees in the Southern Division of the Northern District of Alabama all have 30 years or more of bankruptcy experience as trustees. All of the trustees have shown themselves to be trustworthy and objective, and the Court has no question that no matter which Chapter 7 trustee is assigned to this case he or she will comply with his or her fiduciary duties and will make a judgment with regard to the appeal that is in the best interests of the estate and the creditors. Any suggestion that one of the Chapter 7 trustees would settle the appeal simply to bring quick or easy money into the estate is nonsensical and unsubstantiated.